IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ALGERNON CALDWELL, JR.

      Plaintiff,                                        OPINION and ORDER

v.                                                     Case No. 18-cv-1074-wmc

DEPUTY WOOCK,[1]
DEPUTY NINNEMEN,
DEPUTY FLOYD,
DEPUTY LUCAS and
JOHNATHAN MATZ,

      Defendants.

*Pro se* plaintiff Algernon Caldwell, Jr., is proceeding in this lawsuit under 42 U.S.C. § 1983, on constitutional claims against current or former Dane County Jail employees Deputies Woock, Ninneman, Floyd and Lucas, related to his conditions of confinement while detained in the jail in September of 2019, as well as Johnathan Matz, who addressed his grievance as to those conditions. Specifically, Caldwell contends that for a week defendants disregarded his complaints about a clogged toilet located in a vacant cell on the opposite side of the cellblock from him and limited his access to drinking water for several days, in violation of his Fourteenth Amendment rights. Now before the court is defendants' motion for summary judgment. (Dkt. #109.)

---

[1] Defendants changed the spelling of defendant Wock to Woock. Because Caldwell has not objected to this modification, the court infers that they are correct and directs the clerk of court to amend the case caption accordingly.

There is no dispute that Caldwell was housed near a clogged and backing up toilet from September 3 through 10, nor that the sink in his cell was not working from September 4 through 7. However, as revolting and obviously unpleasant as these conditions may be, there is no evidentiary basis for a reasonable jury to find that the clogged toilet was actually backing up and smelling until the day before it was fixed, and Caldwell had access to drinking water throughout that time. Accordingly, Caldwell cannot meet the high standard for a denial of due process as a detainee under the Fourteenth Amendment. In addition, no reasonable jury could conclude that any of the defendants responded to Caldwell's conditions of confinement in an objectively unreasonable manner. Therefore, the court will grant defendants' motion and direct entry of judgment accordingly.

UNDISPUTED FACTS[2]

**A. Dane County Jail Configuration and Shower and Meal Schedule**

The jail consists of three facilities: part of the City-County Building ("CCB"); the William H. Ferris, Jr. Center ("FC"); and the Public Safety Building ("PSB"). The CCB is a maximum-security facility with 341 beds located on its sixth and seventh floors. Each cell block houses four to eight inmates in individual cells that are connected to a day room or common room.

During the relevant time, Caldwell was housed in cellblock 615, which has eight individual cells. The inmate shower area is located by the first set of doors to cellblock

---

[2] Unless otherwise indicated, the following facts are material and undisputed. The court has drawn these facts from the parties' proposed findings of fact and responses, as well as the underlying, record evidence as appropriate.

615. A second security door allows access to the portion of the cellblock containing the dayroom and the individual cells, with four cells on the right and left side of the dayroom. Each individual cell contains its own toilet and sink. According to defendants, the cellblock also contains a water fountain for inmates, which Caldwell disputes.

Inmates in the CCB had access to the showers in cellblock 615 from 4:45 a.m. until 8:00 a.m. Shower time is limited to those periods due to safety and security concerns, including the need to conduct regular security checks and allow staff to enter the cellblock safely throughout the day.

Inmates in the CCB received three meals a day with a rotating menu. For beverages, inmates usually receive milk or coffee in the morning, a kool-aid packet at lunch, and either milk or a Kool-Aid packet at dinner. If an inmate requests additional water, deputies could provide them with water from a jail-issued pitcher.

**B. Jail Maintenance**

The Dane County Sheriff's Office uses the Dane County Department of Administration, Division of Facilities Management, for all maintenance issues at the jail relevant to this case. When the jail has a maintenance issue, staff sends a work order to Facilities Management describing the request, then maintenance staff documents the work done and when the work order was completed. Because of the age of the jail, Facilities Management receives hundreds of maintenance requests monthly, and Facilities Management has a maintenance worker located in a shop within the CCB itself. As a result, maintenance work in the CCB has also been completed without a formal work order,

and Facilities Management does not keep track of every time one of its staff members addresses a problem at the jail.

### C. Caldwell's Conditions of Confinement at the Jail in September 2019

Plaintiff Algernon Caldwell was a presentence detainee in cellblock 615 in September 2019, where each of the defendants was employed. Although he had been convicted of a crime in May of 2019, he was not sentenced until August 21, 2020.

#### 1. Clogged Toilet

The toilet in Caldwell's individual cell was working during the entire relevant time, but Caldwell maintains that the toilet in another, unoccupied cell, Cell F, was backed up for several days. Cell F was located on the opposite side of the cellblock from Caldwell. But according to Caldwell, anytime an occupant of cellblock 615 used a toilet, it would back up the toilet in Cell F. Caldwell contends that jail staff were all aware of this issue and had left Cell F vacant until its toilet could be fixed. Although the jail offered cleaning supplies to inmates, neither Caldwell nor any other inmate could clean Cell F because that cell was closed off.

On September 3, 2019, defendant Floyd submitted a work order stating that the toilets in Cells E and F were backed up but not overflowing, and that it was possible that trash had been flushed down the toilet. Later that day, the work order was closed with a note that a hook had cleared the clog. Other than one person, whose identity he cannot recall, Caldwell did not speak with anyone, including defendants, about the backed-up toilet in Cell E.

A week later, on September 10, defendant Lucas submitted a work order for Cell F, writing that the toilet did not flush. Caldwell agrees that the toilet was fixed on September 10, but only after he had already filed a grievance *and* appealed another grievance on September 9 about drinking water, complaining that although the water was back on, the feces in the clogged toilet were still present and that the cellblock was starting to smell. The next day Caldwell received a response from defendant Matz that Facilities Management had been informed and addressed the issues. However, according to Caldwell, when he received Matz's response, he still had to talk to another deputy, who in turn called Facility Management, who only then sent a staff member to fix the water pressure issue.

2.  **Drinking Water**

On September 4 at about noon, Caldwell drank water from his sink in his cell and he noticed that the water pressure was weak. About two hours later Caldwell noticed that there was no water coming out of his sink. Although Caldwell maintains that he told multiple defendants about his sink that day, the admissible evidence of record does not permit that finding. First, as to defendant Floyd, Caldwell had alleged in his amended complaint that he spoke with defendant Floyd about the water issue that day, but Floyd did not work at the jail between September 4 and 7 of 2019, and Caldwell conceded in his deposition that he may have mistaken Floyd for another deputy.

Caldwell also contends in his declaration filed in opposition to defendants' motion for summary judgment that on September 4 he informed defendants Lucas and Woock that his water stopped working. (Caldwell Decl. (dkt. #140) ¶¶ 5, 7.) Again, Caldwell's

5

deposition testimony is different. He could not recall exactly when he first informed defendants that his sink was not working, and after reviewing grievance materials, he testified that his conversations with defendants took place starting September 6. (*See* Caldwell Dep. (dkt. #112-1) 15-17.) Because Caldwell's affidavit contradicts his prior deposition testimony, the "sham affidavit" rule prohibits the court from considering Caldwell's conflicting assertion that he spoke with Lucas and Woock on September 4, at least for purposes of defendants' summary judgment motion. *See James v. Hale*, 959 F.3d 307, 315-16 (7th Cir. 2020) (citing *Dunn v. Menard, Inc.*, 880 F.3d 899, 910 (7th Cir. 2018)).

Even so, from September 4 to September 7, Caldwell attests that he had very limited access to drinkable fluids. In particular, on the evening of September 4, Caldwell received a small cup of water with his medications. The next morning, September 5, Caldwell received milk with his breakfast. Caldwell received a Kool-Aid package with his lunch, and he did not ask any jail staff for water. Caldwell testified in his deposition that he saw others in his cellblock catching drizzling water in cups from one cell sink, but he did not attempt to get water from any other cells, apparently because the small amount of water coming out was not enough to be drinkable.

Just after midnight on September 6, a jail employee submitted a work order stating that inmates reported that the water pressure was not working. At some point later that day, Caldwell also asked defendant Woock if the shower doors could remain open beyond the shower times to allow inmates access to that water all day, but he denied that request. Caldwell then asked Woock for two pitchers of water for the cellblock, and Woock

6

provided two pitchers of water later that day.  At his deposition, Caldwell testified that he was able to fill a coffee cup with water three or four times from the pitchers.  However, when Caldwell asked for two additional pitchers of water, he maintains that Woock denied his request because a work order had been placed for the running water.

During his deposition, Caldwell testified that on September 6 or 7, he further told defendant Lucas that there was a water problem in the cells.  Lucas responded that she would have a work order placed.  Defendant Ninneman was present for this conversation, and according to Caldwell, also said that he would speak with maintenance about the water issue.  According to Lucas and Ninneman, because a work order had already been placed about the water pressure issue, they actually declined to submit another work order at that time.  Later that same day (either September 6 or 7), Caldwell showed Ninneman the water pressure in another cell, demonstrating that it was very low and just "drizzled" out of the faucet.  At that time, Ninneman responded that a work order had been placed.  At the same time, Caldwell acknowledges that he did not ask either Lucas or Ninneman for additional pitchers of water, did not complain of thirst, and did not appear to be in medical distress.[3]

---

[3] Caldwell contends that he also requested water from defendant Ninneman around this same time, but his citation to his contention, page 19 of his deposition, does not support this contention. Rather, he merely testified to talking to Ninneman about the water issue two times, not to asking Ninneman for water.  (*See* Caldwell Dep. (dkt. #112-1) 19).)  Caldwell also cites another inmate's affidavit, who attests that he, not Caldwell, asked for water from Ninneman.  (Reeves Aff. (dkt. #141) ¶ 15.)  Even accepting his contention as something Caldwell could offer at trial as a *pro se* litigant, since it is not directly contradicted by his deposition testimony, it would not change the court's analysis of Caldwell's Fourteenth Amendment claim for the reasons explained below.

On September 7, both of the pending work orders were completed and maintenance replaced both water filters for the unit. Moreover, during the time that the sinks were not functional, the showers in the cellblock were working and available to the inmates during shower hours. Caldwell further testified that although he could have taken a cup to the showers to drink that water, he never attempted to drink water from the showers because the water was warm. Finally, as of September 7, between about 4 and 5 p.m., the water in Caldwell's cell was again working.

Caldwell further acknowledged that he did not suffer physical or mental health injuries, nor did he seek out medical treatment, because of any of the conditions of confinement in cellblock 615 in September 2019. Caldwell also testified that he was never diagnosed with dehydration and did not claim any future damages.

OPINION

Summary judgment must be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If there is any genuine issue as to any material fact, however, the court cannot grant summary judgment. *Id*. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). Finally, "[t]he evidence of the non-movant[s] is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Id*. at 255.

While plaintiff's post-conviction, but presentence status in September 2019 arguably make him subject to the even higher Eighth Amendment standard of cruel and unusual punishment, the court will assume he is still entitled to the protections of a detainee. Specifically, the Court of Appeals for the Seventh Circuit has concluded that conditions of confinement claims brought by pretrial detainees are governed by the standard found in the Due Process Clause of the Fourteenth Amendment as set forth by the United States Supreme Court in *Kingsley v. Hendrickson,* 576 U.S. 389 (2015). *Hardeman v. Curren*, 933 F.3d 816, 821-22 (7th Cir. 2019). Under this standard, a plaintiff must demonstrate that: "(1) the conditions in question are or were objectively serious (or if the claim is for inadequate medical care, his medical condition is or was objectively serious); (2) the defendant acted purposefully, knowingly, or recklessly with respect to the consequences of his actions; and (3) the defendant's actions were objectively unreasonable—that is, "not rationally related to a legitimate governmental objective or . . . excessive in relation to that purpose." *Id.* at 827 (Sykes, J., concurring).

Defendants seek summary judgment on four grounds: the conditions of Caldwell's confinement between September 3 and 10 of 2019 were not severe enough to implicate his due process rights, their responses were not objectively unreasonable, Caldwell did not suffer injury because of the conditions of confinement, and on qualified immunity grounds. Because the first three arguments are dispositive, the court need not address defendants' claim to qualified immunity.

I.  **Severity of Conditions**

With respect to the severity of the conditions, the Seventh Circuit has not specified exactly how severe the deprivation must be to implicate the due process clause. In more recent decisions addressing claims involving this objective component, the Seventh Circuit appears to apply an equivalence of the Eighth Amendment standard to the Fourteenth Amendment. *See Thomas v. Dart*, 39 F.4th 835, 841 (7th Cir. 2022) (applying substantial risk of serious harm standard to failure-to-protect claim); *Williams v. Ortiz*, 937 F.3d 936, 942 (7th Cir. 2019) (applying serious medical need for a medical care claim). Regardless, to avoid summary judgment there must be evidence sufficient to permit a reasonable fact-finder to conclude that Caldwell was deprived of sufficient water to stay hydrated or subjected to unhygienic conditions because of the clogged or backed up toilet. Even construing the evidence of record in his favor, no reasonable jury could find that the circumstances were sufficiently serious to implicate plaintiff's due process rights.

As an initial matter, the Seventh Circuit stated in *Hardeman* that "[a] single clogged toilet does not violate the Constitution." 933 F.3d at 823. There is no dispute that Caldwell's cellblock contained a single clogged toilet for a week -- from September 3-10, 2019. It is also undisputed here that Caldwell's cell was on the other side of the day room from Cell F with the clogged toilet. In addition, Caldwell submitted a grievance about the clogged toilet on September 7, writing that the toilet in Cell F had been "clogged with feces for 5 days," and on September 9, he appealed that grievance, stating that even though the water in his cell was back on, the toilet in Cell F was backed up and starting to smell. (*See*

10

Voeck Aff. Ex. 1 (dkt. #114-1) 1.)  However, there is no dispute the toilet was fixed the next day, September 10.

Moreover, there is no evidence that Caldwell was impacted by the clogged toilet until September 9, when Caldwell reported a smell.  Similarly, there is no evidence that: Caldwell was unable to use his own toilet; the odor made him (or any other inmate) ill; the clog caused sewage to leak onto any cellblock floor near Caldwell's cell; or there was any other adverse effects of the backed up toilet.  Accordingly, although the clogged toilet may have been unpleasant for Caldwell, that condition on its own is not enough proof for a reasonable jury to find that Caldwell was living in unhygienic conditions.

As for his access to drinkable water, the objective fact is that Caldwell was not deprived of drinkable fluids.  Indeed, he conceded during his deposition that:  he drank water from his sink on September 4 between 11 a.m. and noon; he also had a small cup of water that evening with his medications; on September 5, he received a cup of milk with his breakfast and a cup of water with his medications that evening; on September 6, he received a cup of milk in the morning, three or four cups of water during the day from the water pitchers defendant Woock provided and a small cup of water with his medications that night; and on September 7, he received a cup of milk in the morning, as well as running water again between 4 p.m. and 5:30 p.m. that afternoon.  In addition, each day Caldwell had access to showers in the morning, and although his position is that he did not have unfettered access to the showers during that time, he does not attest to making any attempt to access the showers for water or being prevented from doing so.  Finally, although Caldwell did not use the water that was still "drizzling" from another sink in another cell,

11

he does not deny that other inmates were filling up their cups from that cell, meaning that at minimum, he still had access to that water as well.

Caldwell argues that this consumption was less than the jail detainees in *Hardeman*, but in that case *all* water to the *entire jail* was shut off for three days. Although those detainees each received five water bottles per day, they had *no* access to running water, and when the detainees asked for more water those requests were denied and placed in lockdown. *Id.* Furthermore, also unlike Caldwell, those detainees could not flush their toilets, were exposed to *hundreds* of non-functioning toilets, and did not have access to running water to shower, drink, take medicines, brush their teeth, or clean their living areas. *Id.* at 824. Worse, each cellblock received a barrel of water for bathing, cleaning cells, and flushing toilets (and then, only when feces were present). Finally, unlike Caldwell or others on his unit, the *Hardeman* detainees became ill, with feces built up in the non-functioning toilets that had attracted insects.

Indeed, beyond the limit on drinking water from sinks, Caldwell's conditions of confinement were not unhygienic at all. Caldwell and the inmates in his cellblock had: functioning toilets; access to a shower for multiple hours every morning; at least limited access to drinking water and other liquids; and did not suffer injury or dehydration. In any event, the Seventh Circuit did not rule in *Hardeman* that inmates who receive five water bottles or less stated a conditions of confinement claim; its decision was limited to whether it was clearly established that the *combined* conditions were constitutionally infirm.

**II**. **Defendants' Response to the Conditions**

Even if Caldwell's limited access to drinking water for a few days makes this a closer call, none of the defendants responded in an objectively unreasonable manner. As an initial matter, personal involvement in the constitutional violation is a prerequisite for liability under § 1983. *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018). Since Caldwell concedes that defendant Floyd should be dismissed because they did not speak on September 4, 2019, Floyd is entitled to summary judgment.

As to defendant Woock's involvement, it was limited to his interactions with Caldwell on September 6, when he provided the inmates in Caldwell's cellblock two pitchers of drinking water, although he denied Caldwell's request for unfettered access to the showers and for more pitchers of water. At the time of his interactions with Caldwell, however, there is no evidence to dispute that Woock believed a work order had been placed to address the non-functioning sinks. Indeed, there is no evidence allowing even a reasonable inference that Woock believed Caldwell or anyone else on his cellblock was not receiving beverages with his meals or going without drinkable fluids for any extended period.

The result is the same for defendants Lucas and Ninneman. Caldwell acknowledges that when he spoke with Lucas on September 6, he did not explicitly ask for drinking water or tell Lucas that he was dehydrated. Nor did Caldwell tell Lucas that he was not receiving adequate fluids when they interacted. Therefore, Lucas's failure to do more than confirm that a work order had been placed is insufficient for a reasonable jury to find that she purposefully responded unreasonably to Caldwell's lack of drinking water that day.

13

Similarly, a reasonable jury could not fault defendant Ninneman's response to Caldwell, by confirming that a work order had been placed. Even Ninneman's decision not to provide Caldwell water after their two conversations on September 6 or 7 was not objectively unreasonable on this record, because *no* admissible evidence suggests that he knew or had reason to believe that Caldwell had gone without drinking water for multiple days: Caldwell did not complain of dehydration; nor did he tell Ninneman that drinking water from his sink had slowed or stopped on September 4. Indeed, there is *no* evidence to infer that Ninneman had reason to believe Caldwell lacked any drinkable water when they spoke on the 6th or 7th.

Finally, defendant Matz seeks summary judgment because his only involvement was responding to Caldwell's grievance. As a general matter, ruling against an inmate on a grievance is not sufficient personal involvement for liability under § 1983. *See McGee v. Adams*, 721 F.3d 474, 485 (7th Cir. 2013); *George v. Smith*, 507 F.3d 605, 609-10 (7th Cir. 2007) ("Ruling against a prisoner on an administrative complaint does not cause or contribute to the violation."). In fairness, a jail official may be liable for mishandling a grievance related to an *ongoing* constitutional violation that he or she could remedy. *See also Owens v. Hinsley*, 635 F.3d 950, 953 (7th Cir. 2011) (finding that the "the alleged mishandling of Owen's grievances by persons who otherwise did not cause or participate in the underlying conduct states no claim").

However, the record does not suggest that Matz failed to remedy an ongoing constitutional violation. To the contrary, his response was reasonable: he notified Caldwell that maintenance staff had been informed about the issue in his cell and were

promptly addressing it.  There is no evidence that when Matz responded to Caldwell's grievance, he knew or had reason to know that maintenance staff were not promptly addressing the issues Caldwell raised about the water in his cell.  Therefore, Matz's response that maintenance staff had been notified about Caldwell's concern was not objectively unreasonable, and he, too, is entitled to summary judgment.

**III.  Injury**

As for injuries, Caldwell has identified no physical injury of any kind, past, present or future.  Nor has he identified any more than minor psychological distress.  For that reason as well, defendants are entitled to summary judgment.

ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment (dkt. #109) is GRANTED.

2. Defendants' motions in limine (dkt. #130) are DENIED as moot.

3. The clerk of court is directed to enter judgment accordingly and close this case.

Entered this 22nd day of May, 2023.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge